And we'll hear counsel in the final case on the calendar today, U.S.A. v. Connolly. Good afternoon, Your Honor. May it please the Court. Good afternoon, Your Honors. My name is Ken Breen. I represent Matt Connolly. We had further discussion among counsel earlier. And Seth Levine for Gavin Black will begin as the first appellant. That's fine. We'll hear from Mr. Levine. Good afternoon, Your Honors. May it please the Court. I'm Seth Levine and I represent Gavin Black. I'd like to focus today on falsity and due process. First, there was a failure of proof on the issue of falsity. There was no evidence that any of Deutsche Bank's LIBOR rate submissions were outside the reasonable range at which Deutsche Bank could borrow. Nor was there any evidence that Gavin Black or anyone else believed that such a rate was submitted. As a result, none of the submissions were false under the rules of the British Bankers Association, the sole authority for LIBOR. And in key part, the definition requires only the submission of a numerical estimate of rates at which the bank, quote, could borrow. And the BBA did not require the use of any particular methodology to arrive at that estimate. So we then turn to the question of the falsity of the range. As the evidence shows, and this Court recognized in Allen, a LIBOR submitter had to select a single rate from among a range of reasonable rates. So there's no one right answer. There's a range of right answers to choose from. And the structure of the definition, the rule, provides two reasons for this. The first of which you didn't address in common. One is the loan size, the concept of reasonable market size. The BBA did not define how large the loan that your hypothetical estimate was supposed to consider. And because the evidence is that borrowing costs increase as the size of the loan increases, that naturally creates a range of different prices for different sizes. And the loan size under the rule can be considered and changed on a daily basis. So the submitter has to consider those possibilities. Secondly, as you recognized in Allen, estimates are imprecise. And they have to be made before 11 o'clock to submit on the 15 different loan sizes that have to be submitted. And like in Allen, that is done by gathering market information. And DaVinci Bank submitters didn't have a single method to do that. They used a variety of indicators. They used broker quotes. They used several pricers. And when combined with the loan size latitude, that creates a wide range of different reasonable borrowing rates from which to select any day's submissions. So the question comes down to how do you choose within the range? Well, just like how you calculate the estimate, the BBA provided no methodology or direction on how to choose between reasonable alternative estimates. It just said submit one rate. And as the government cooperator James King testified, he always put in a reasonable rate, even when he had trader requests. In fact, there is no evidence in this record that Deutsche Bank submitted any rates outside a reasonable range. And as I said, does anybody believe they did so? Therefore, there is no evidence that any submitted rate contained a false statement of either fact or opinion because falsity is not proven. And there is strong support in the record for this view of falsity beyond the language of the rule, although we need not. And that comes in the form of a very important letter that the Chicago Mercantile Exchange, the world's largest at the time LIBOR-related trading market, submitted to the BBA confirming the understanding of falsity as part of a process to reconsider the LIBOR definition. And I'd like to read that to you, and it's Joint Exhibit 4711. A contributor panelist who can borrow, quote, in reasonable market size, unquote, at anyone of a wide range of offered rates, commits no falsehood if she bases her response to the daily LIBOR survey upon the lowest of these or the highest or any other arbitrary selection from among them. The CME makes clear any submission within the range is truthful. It does not matter what the motivation is. Now, the government tries to sidestep the CME letter. I'll be suggesting it be rewritten to replace the word arbitrary with random. I'd like to consider this suggestion because I think it shows that the government's case cannot be sustained. Let's assume that on a given day... Your initial three minutes have expired. Thank you. Let's assume on a day there was a reasonable range to make it easy between six and seven. And the submitter chose 6.6 out of a half, totally random. To the government, that is a truthful submission. But if the submitter arbitrarily picks 6.6 in part based on a trading position, the same 6.6 is now false, according to the government. Respectfully, this is nonsense. 6.6 is either truthful or it is not. It is either believed to be within the range or it is not. The motivation for the selection does not impact truthfulness. And this very point was something that another government cooperator, Mr. Kertler, the leader and the boss who ran the submission process, agreed with on cross. And this appears at Joint Appendix 3457 on page 19 in our brief. And it makes the point perfectly clear. Kertler agreed, quote, the fact that somebody has a trading position doesn't mean that what they're saying about the market isn't true. And the reason for that, I respectfully submit, is that intent and falsity are different elements. And what the government is asking you to do here is to first conflate them and then just simply eliminate the requirement of falsity. And that's not respectfully the law. Moreover, it is clear that the government simply invented this rule that a reasonable rate submission transforms magically from truthful to false if it is influenced by a trading position. Why? One, it's not in the BVA rules. It doesn't say that anywhere. And the BVA, after all, is a trade association in the United Kingdom. It's not the law. It's nothing more than that. Two, the evidence in the case shows that that interpretation of the rule is inconsistent with how people behave. The BVA, BVA member banks like Deutsche Bank, allow derivatives traders to serve as submitters. Mr. Kirtler and Mr. King, the government's main cooperators, were derivatives traders while they were submitting. The markets, as we pointed out, knew this. Goldman Sachs, an alleged victim here, although the count was dropped against my client, noted as what everyone knew. Derivatives traders make LIBOR submissions. And remarkably, since the BVA is supposedly deceased here, the BVA did not change its rules on derivative traders until years, literally years, after the events in this case. So one sees here, Your Honors, that whatever instinct there is, the rule itself reflects the need for a range because you can't run it any other way. And it is clear that you have to pick something reasonable within that range. And that interpretation is not only confirmed by the language, but it's also confirmed by the largest market for LIBOR. And they submitted their letter when the BVA decided it was going to not change the reasonable market size definition. And the CME pointed out, that's fine. Recognize this is what falsity means under the rule currently. And the BVA responded, thank you all for all the comments, for keeping reasonable market size unchanged, accepting that this is a correct interpretation. Now, there's no rule, there's no mechanism to choose. All you have here is the ability of someone to choose a rate that the bank can borrow at. And nothing else happened. Excuse me. In addition to... Your time may be up. May I just make one final point on due process, Your Honor, very quickly? Sure. Thank you, Your Honor. Your Honor, in addition to not establishing falsity, and essentially creating a thought crime, because you no longer have to commit the fraud. You just have to have bad thoughts when you're submitting a truthful rate. The literal language of the rule in the CME letter showed that our interpretation is at very minimal, a reasonable one, if not the correct one. And therefore, under the clear notice provision of due process clause, the government's interpretation is not unambiguously in its favor. And it has to fall. Finally, on due process, respectfully, Your Honors, due process bars the government from criminalizing conduct on standards and rules it invented after the fact to prosecute a UK citizen, like Mr. Black, with no ties to the United States, in pursuit of what prosecutors' personal predilections may tell them. But they're not allowed to literally initiate a retrospective prosecution that changes truth into falsehood. And I respectfully pray that this court reverse, as justice requires it. And I thank the court very much for its consention. Thank you. Judge Kears, any questions for Mr. Levine? No questions. Thank you. Judge Pooler. Thank you very much. Isn't it true, counsel, that no matter what, whether the number given for the fixing was within the reasonable range, isn't it true that it's shaded toward the trader's interest that the counterparties lost money, including U.S. banks, including the FHA? Isn't that true? Your Honor, the answer to that question is it's not clear, because what you don't know is no one trades these positions alone. They're all hedged in a million different ways. So whether on any particular transaction somebody lost or gained doesn't tell you anything about their net position. And so it is something that the government did not even seek to prove. And there's a very, very complicated question as to whether there's been any actual loss here. But the court is correct that there is a theoretical, there is a possibility that under certain circumstances money can be gained or lost. And what I'd say about that is, Your Honor, everyone was well aware of the LIBOR system and how it worked, and the rule was clear. And it's simply not appropriate to basically change the rule after the game is played to say that conduct that wasn't prohibited is now prohibited because there is an instinct. There is a view that this doesn't mean... If I can interrupt. Is it true that you're arguing because no one told us this was illegal, we could do it? We could do whatever wasn't specifically prohibited? Is that what you're arguing? No, Your Honor. My argument is that what the rule required was a reasonable good faith estimate be submitted at the cost that you could borrow. Once you satisfied that requirement, you satisfied the rule. This is not a case of anything other than people following the rules as they were written. One can have a debate of whether LIBOR had weaknesses, if it had conflicts of interest. In fact, as the court knows, LIBOR is being eliminated. But what you cannot do is to invent a new rule now. Is there a new rule not to cheat? It is not cheating, Your Honor. You are submitting a truthful rate. Just as the CME who supervises the largest market said, if you put in a rate that you can borrow at, according to the CME and according to the rule, it is truthful as long as it's within a reasonable range. Now, if you submit a rate which you do not believe is in the reasonable range for a bad purpose, then yes, that would be a problem. That would be a potential violation. But this case, we don't have that. In this case, the evidence is undisputed that they never put in a rate outside the reasonable range. And remember, 16 rates are put in every loan size. And VBA immediately throws in the garbage the top four and the bottom four and averages the other eight. So, whether or not the point is that those were the rules as they were set up, those are the rules as they are written. And I recognize, Your Honor, that there is an instinct that says this system doesn't seem like it was a very good one. Okay, it was started a long time ago and it was a back of the envelope kind of system. You can change it, but you can't regulate or reform through criminal prosecution of a couple of LIBOR traders because everyone doesn't like the fact that the system was weak. And that's what happened. And in fact, even the district court at sentencing found that's what happened. So, I would respectfully ask that we look at what the rule says. It requires a range. And the fact that here there was not a single submission that was ever made that was outside that range or is believed to be outside the range. And to the extent that there was a concern that this was not a good system or this was as a matter of business ethics, this is troubling, those are wonderful conversations to have. But they should not be had in a criminal courthouse taking people from their countries to try to imprison them for something that doesn't violate the rule. When the party who wrote the rule, the BBA, knew everything about this and even specifically rejected a change, Your Honor, when the CME pointed out what falsity means on this rule. They could have said, you know what? You're right. This is too loose. Here's a methodology for how you're going to select the rate. Here's a calculator for how you're going to do it. Here's a way that you select between rates. We're going to bar anybody who has any trading positions on from being part of the process. That all happened. It just happened several years after the facts in this case concluded. So there is no need, and we do not defend, but there are parts of LIBOR that have been subject to criticism. But what's happened here is the government doesn't like the rule as it's written. It doesn't like the fact that the entire marketplace, Mr. Cutler, Mr. King, not only were LIBOR submitters, the entire banking industry encouraged LIBOR submitters to be derivative traders. My client, who never submitted a LIBOR, didn't have access to the system, was instructed to share his views with the submitters, and they did it on worldwide phone calls. The bank literally put the desks of the submitters and the derivative traders together so they could talk. And here's one more point. There is not a shred of evidence in this record that my client ever expressed a view that did not reflect his good faith view of the market. And if you look at the testimony, the cooperators, when questioned about Mr. Black's views on the market, agreed with him that he had thoughtful views. He had trading positions. They all had trading positions, but it didn't mean his views weren't true, and the government presented no evidence, none, that Mr. Black ever took a position or made a request that was not consistent with his good faith view of the market. So unless you're going to adopt a rule that says, because you chose 6.6, because you have impure thoughts, that's false. But if it's not true, pick it up. Mr. Levine, let me follow up a bit, if I may, on what I took to be Judge Pooler's concern earlier. I think we're talking about the definition of fraud under the federal statutes. And I guess my question is whether we ought not to consider community expectations and norms of fair play when we determine what counts as fraud. That, I think, was part, at least, of what Judge Pooler was aiming at. And I'm asking you the same questions. Why shouldn't we consider community expectations and norms of fair play? I'm sorry, Your Honor. No, go ahead. Apologies, Your Honor. Your Honor, I think the question you're asking is about questions of intent. If somebody is doing something that they know or learn that is wrong, should that be taken into consideration? Certainly, on the question of criminal intent, that is taken into consideration. It was taken into consideration here. There's just no evidence of it. But I respect you talking about something different, because this is the problem, Your Honor. This is the heart of the problem. The government wants to substitute the moral intuition, maybe the correct one, that this shouldn't have been working this way. It must have been wrong. And it wants to take it just from being an intent-based issue, whether you've satisfied that element. And it wants to engraft it to basically remove the bedrock principle that, in this kind of a case, that there has to be a false statement. And here, the only statement is a numerical number. It's a number that's submitted without qualification, without any comment. And what I'm saying, Judge, is you certainly can take into account, and courts do, what the standards are that will lead somebody to know. But you can't say that the same number is both true and false about the market. If the government could have proved that numbers were being put in outside a reasonable range, that's different. But here, you had, under the governance theory at very most, no false statements. But you had, in their view, bad intent. Now, I dispute that. I think there's no evidence in this record that my client ever did anything inconsistent with good faith belief. And, in fact, there is no record, there's no testimony at all that he did. But I agree that your question is both the question that one needs to focus on because it shows the problem. You have to have both. You can't take a fraud, Your Honor, out of fraud. If all you have is you have taken an action that you did it within your thoughts, when you were thinking about putting the number in, you were trying to make money. Now, profit motive has never under the wire fraud statute been a thought that in itself requires a conviction. In fact, if it did, we couldn't do business. But even taking your hypothetical one step further and saying, okay, let's say whatever was being thought of is somehow wrongful in some general sense.  If you take away the need to actually prove factual or believed falsity, then it's just a thought crime. Hey, I expressed a completely good faith view of the market. I was right about the number, which is what you see throughout this entire record, Mr. Black. But, yes, I have a trade on. Now, the fact is that my market view, because I'm a derivatives trader that has to come to work every day, and if the market doesn't behave properly, I got a lot more problems than one trade. But the point, Your Honor, is yes, you can consider it, but it cannot overtake. It cannot replace actual fraud, the actual falsity, because then there's no false statement. And then what can the government do? Mr. Levine, let me just ask a final question. At the beginning of your argument, you made a glancing reference to the sentencing judge, Judge McMahon's views, which you seem to think were significant with respect to the character of these prosecutions. Would you care to elaborate on what you were referring to? I was referring, Your Honor, simply to the fact that at sentencing, the district court made many comments to the fact that these men were being made scapegoats for an entire industry. Now, I part ways with the district court because I believe no crime was committed. But from a due process point of view, and looking at what has happened here, and looking at how my client has had to come to this country and defend himself from something where there is no rule, and he has violated no rule, and given the way this prosecution has been conducted, frankly, you raise some of these questions in the oral argument at Allen. There were very profound questions here. There were other decisions in this case the court may be aware of, including outsourcing of governmental investigations. There were significant issues about wrongful conduct in the prosecution in this case. They're not raised on this appeal. What's the theory of scapegoating here? Why do some people believe, or might one claim, that the two individuals here, Black and Connelly, might be scapegoated compared to others? Perhaps you could just take a minute, maximum, to describe the course of these Lebor prosecutions. They're being handled by Maine Justice, is that right? Yes, Your Honor. There's no Lebor case handled by anybody at Maine Justice. And there are only three in the United States that were prosecuted. Allen, this one, and there was a Sock Jen case, but I think that that may have been resolved. But, Your Honor, what you do have is numerous banks, all of whom have been prosecuted for this conduct, but none of their senior folks. The evidence in this case, Your Honor, was that every single thing that my client did was open and notorious, and not only open, it was the policy of the bank. The bank required derivative traders and cash traders to sit together so they could talk. There was a worldwide required phone call of all the traders to exchange this information. All of this, and this was true throughout the banks, and, in fact, there is evidence that the judge referenced in her sentencing that the BBA, central banks in Europe and the United States, were involved, at times, in moving Lebor during the financial crisis. And I think the evidence is they were. So the notion here that these guys somehow defrauded the BBA, who is in the middle of this, and who knew about these rules and themselves, their conduct has been put under scrutiny, I think Judge McMahon properly noted, was very troubling to her. And I think the record, some of which you note in Allen, demonstrates that these prosecutions really were selecting a few people for prosecution for what I believe are retroactively created crimes. And I think that there is a profound problem there. And I know Mr. Breen can also elaborate on that, but I don't want to go over my time. That's all right. We'll hear from Mr. Breen now. Thank you, Your Honor. Thank you, Your Honors. May it please the Court. I represent Matt Conley. And just to be clear, Matt Conley was not a Lebor derivatives trader at Deutsche Bank. He was not a Lebor submitter. He only nominally supervised a trading desk in New York for Deutsche Bank. Picking up on the comments about the district court at sentencing, the court found that Matt Conley was not a manager or a supervisor of the alleged Lebor scheme, that the Lebor was run out of London, not New York, that Matt Conley had very little to do with Lebor as part of his job, that he was a person who, quote, had the least to do with Lebor or manipulation of Lebor in all of Deutsche Bank. And she found that both Matt Conley and Gavin Black were both low in the totem pole. The government cooperated down, using cooperators, including submitters, managing directors, to go after Matt Conley, a mid-level manager of a desk in New York, and Gavin Black, a mid-level employee in London. While a lot of other people were not charged, the government did not prove fraudulent intent. All the evidence showed that Matt Conley acted in good faith, like he thought he should and was supposed to. He followed the Deutsche Bank policies and procedures, believing that there was permissible leeway within a reasonable range, as Mr. Levine described. He on three occasions made conditional requests, in the manner the BBA rules permitted, and never asked for anything outside the reasonable range. At its core, the case against Matt Conley rests on merely three email exchanges and a lying cooperating witness. Three times, Matt Conley made requests, and they were all within the BBA rules, all explicitly conditioned to stay within the rule. The first, if you see the market higher. Second, we would prefer it higher. Third, if possible, lower. These emails said openly on the Deutsche Bank email system. Three emails that exonerate him, they don't implicate him, because they show that he acted in good faith. And now the lying cooperating witness, Tim Perietti, the only cooperating witness in the New York office. Thus, the key witness against Matt Conley, who, as the District Court found, only nominally supervised him. He got paid more, he was a derivatives trader. But nominally, he was supervised. That's why Matt Conley got charged. But Perietti was deemed not credible by the judge and jury. If I could, I've got another two minutes, and I can probably get to a point where there will be a lot of questions. Go ahead. Thank you, Your Honor. He was deemed not credible by the judge and jury. The jury acquitted on the counts which it needed to believe Tim Perietti exclusively, counts 8 and 10. The District Court found he was guilty of at least quibbling and possibly outright lying. She noted on her reading of the verdict sheet, the jury did not believe Perietti. But even what Perietti said, Conley talked about his own thoughts, that he thought the conduct was wrong, not fair, objective. He never shared that view with Matt Conley, Gavin Black, or anyone else. Fraudulent intent should not be imputed for personal views of right and wrong that were not shared. And the same goes with the views of Kirtler and King, who Matt Conley had no relationship with. The government did not prove fraudulent intent and did not prove that Matt Conley did not act in good faith. I'll pause. Thank you. Judge Kearse, any questions for Mr. Breen? No questions. Thank you. Judge Pooler, any questions for Mr. Breen? I just have one. Isn't it true that the jury was the judge of whether witnesses were lying or not? And isn't it further true that many of these cooperating witnesses said they knew what they were doing was wrong? Isn't that correct? Well, Your Honor, first, the jury decided not to convict. They acquitted on the counts where Perrietti was the only witness, as to Matt Conley. So the jury did speak. And that's why you can trust and you can rely on the fact that he was not credible. Because on the counts, the isolated accounts that we can look at and that district court was focused on, when she made that comment, the jury decided. So that's first. Second, the views of the cooperating witnesses all testified about feelings, about not being fair. But views that they didn't talk to anybody about. I mean, they didn't share that view. I mean, to get a view, well, first of Koeppler and Cutler, who he hardly knew were in light of views in New York. I mean, Perrietti, you know, he was the only person in New York who knew Matt Conley. And he was the one who testified about his own views of right and wrong. But he acknowledged he had never spoken about those views to Matt Conley. And then Matt Conley had never spoken about his views on it to Tim Perrietti. So I agree with the premise, Your Honor. But I think that that falls in favor of there not being a case that was sufficient as to Matt Conley. I hope that answers your question. Yes, it does. Thank you. I have no further questions. Thank you. All right, Ms. Cabreen, you've reserved a couple of minutes after we've heard from Ms. Rao. Let's hear from Ms. Rao for the government. Your Honor, there was one other issue I really wanted to address, if I could just have two minutes more. The case against Conley was time barred. There was no financial institution that was directly affected under FIREA. Tenure or statute of limitations does not apply. If the five years applies, all these charges are time barred against Matt Conley. And that's not – they didn't prove that there was a newer or increased risk of loss as to which makes counterparties. They were all hedged. They didn't prove how much. They didn't prove any loss that was experienced or realistic prospect of loss or how a risk of loss increased. The counterparties couldn't answer that. They didn't have the questions. All they said is they weren't perfectly hedged. That's not proof that there was any loss. And even if there was a loss, it wouldn't have been a significant loss, a risk of loss that is more than de minimis because that's how hedged trades work. And with Deutsche Bank, it didn't affect Deutsche Bank because there were no fees or expenses that were connected to the conduct. There were only three witnesses testified about being interviewed by lawyers. But there was no bank employee to talk about the origin of any investigation or scope or how much it cost. Even with the attorneys that conducted the interviews were employed by Deutsche Bank at all. Thank you, Your Honor. I appreciate the extra time. No, thank you. Ms. Rao. May it please the court, Sangita Rao on behalf of the United States. If I'm permitted rebuttal on the cross-appeal, Your Honors, I respectfully ask to reserve one minute. Counsel made several colorful comments and accusations about the trial team. And while those characterizations are not accurate and do not provide the full picture, the record below speaks for itself. The district court systematically and thoroughly rejected their claims based on those accusations. And given that they're not an issue here today, the government is not going to respond further. On sufficiency, liveware manipulation schemes was a classic scheme to defraud. In arguing to the contrary, defendants turned the required deferential standard of review on its head. By looking at the evidence in isolation and without drawing all reasonable inferences in favor of the jury's verdict as it must. As did the district court. The district court relied on Heriady's testimony in denying the acquittal motions. It relied on all the evidence and a thorough opinion. And that's what the court must do as well. Under the proper standard, this is what the jury could find. The liveware submitters, King and Kertler, had the expertise to come up with an honest estimate of the bank's borrowing costs for the liveware instructions. Their process mostly relied on a pricer, but they also used their expertise and other data to sometimes adjust the number from the pricer to come up with their honest estimate. But rather than submitting that honest estimate of Deutsche Bank's borrowing costs, the submitters sometimes submitted biased rates in response to requests from defendants and a small group of traders within Deutsche Bank to move the submissions up or down to benefit their trading positions. A small amount to avoid detection. As to Black, King testified, Gavin Black occasionally asked me to manipulate the rates or to put in a submission that was higher or lower than I would have done to benefit his trading positions. And that's at Joint Appendix 1825. As to Matt Connolly, he said, Matthew Connolly on occasion made requests for me to change our LIBOR rates and to benefit the trader's position. That's at Joint Appendix 1829. Now, at Government Briefs 16 to 20, we describe the specific requests from both defendants. And there's one from Mr. Connolly on November 28, 2005, that's particularly illustrative. Connolly asked for a higher one-month LIBOR because New York was on the receiving end of a $15 billion notional amount. In response, Kirtler emailed Connolly, looking like 29 in one-month LIBOR, we went in 295 for you. That's at Joint Appendix 4729. And the submission that day was, in fact, 4.295% rather than 4.29. That transaction is a direct example of materiality. Going in at a higher submission that day skews the final LIBOR fit upwards and would have cost the counterparties thousands of dollars on the referenced notional amount. And we describe this in full at Government Briefs 55 to 56. This was fraudulent. Although defendants make a lot of arguments that the BBA instruction was vague or allowed this or they didn't understand that it wasn't allowed, the jury rejected all those arguments. And defendants, in fact, got a very defense-friendly jury instruction. The jury was instructed that the government has the burden to negate any reasonable interpretation of the instruction that would make Deutsche Bank's submission responsive. That's what the jury had to find before returning the guilty verdict. The court shouldn't second-guess the jury. And I'd like to address the reasonable range argument unless the court would like to ask questions instead. Judge Kears, any questions for Ms. Rao at this point? Yes. You said in Allen that LIBOR submissions are necessarily imprecise even when there was decent market information such that at any given time there existed a range of reasonable LIBOR submissions. Is it the government's view that that is not so? Your Honor, no. It's true in this sense. There's flexibility inherent in an estimate. And, therefore, different people can honestly arrive at different estimates. But that does not mean that the jury had to believe that either the BDA, the marketplace, or the defendants believed that it was permissible for the conspirators to arrive at an honest estimate and then skew it to benefit trading positions, just as long as they kept their changes small as part of the scheme to not get detected. And there's good evidence to support this. The jury was entitled to rely on and draw inferences from the expert testimony. Dr. Yule, the government expert, testified at Joint Appendix 1762. And I'm going to leave out some words, but everything I do say is a quote. In the course of my research and in every financial concept, I've never heard of that idea before, that there was a range of true borrowing costs that banks could choose from. Rather, there was always an understanding that they would submit the one best estimate of the true borrowing costs they had. The conspirators, likewise, rejected the idea that they could arrive at their honest estimates and then move their submissions within a reasonable range. At Joint Appendix 3672 to 33, Kertler denies that in setting LIBOR, quote, you could move within a wide range of offered rates. Rather, he said, the submitter has to come up with a rate. And he further testified that he's never even heard of this concept, that it was permissible to move LIBOR submissions within a reasonable range to accommodate trading positions until after the investigations began. That's at Joint Appendix 3671. And Mr. Levine, I believe, refers to King's testimony that he always submitted something within a reasonable range. Well, yes, King said on Cross-X that he kept his LIBOR submissions within a reasonable range to have a better chance of influencing the fix and avoiding BBA scrutiny. It was part of the fraud to keep the adjustments small so that they could not be detected and keep the fraud going and keep taking money out of counterparty's pockets. The defendants happily rely on the CME letter, but that's misplaced. They argued their interpretation of that letter to the jury, and the jury rejected it. The letter doesn't say a panel bank can move its LIBOR position to benefit its trading position. The jury could reasonably believe that if such a shocking practice were permissible, surely market participants would have discussed it explicitly. The jury could instead reasonably believe that the CME was simply acknowledging in the portion relied on by defendants that because of the flexibility inherent in an estimate, it's possible for people to honestly arrive at different rates. But the really important part of that CME letter is that it actually notes the problems of false or biased responses to the daily LIBOR survey. And it makes clear that it's discussing the situation where there is, quote, a legitimate difference of opinion, quote, quote. That's a joint appendix 4711. So the jury could reasonably interpret the CME letter as inculpatory, and it certainly wasn't required to find it exculpatory. And I can explain a little bit more about why the evidence is so clear that the market participants understood that the BBA rate was not supposed to be biased for trading positions. Well, Ms. Rao, maybe it would be helpful if you could turn your attention to the government's cross appeal. Of course, Your Honor. The district court plainly erred in imposing on defendant blacks a foreign home confinement sentence without determining that it was both feasible and appropriate after expressing doubt on both floors. The district court here imposed that sentence without determining three things. One, the feasibility of probation administering home confinement in a foreign country. Two, the appropriateness of allowing defendant blacks to use his wealth to fund monitoring by a private contractor, an option that might exacerbate inequities based on socioeconomic status. Or third, the foreign policy implications of a U.S. court's order confining a British citizen to a certain location on British soil enforced through surveillance. The district court itself expressed doubt that its sentence could be implemented. It recognized both that implementing such a sentence through contractors might be inappropriate and that monitoring from abroad by the probation office might not be feasible, yet imposed the sentence anyway, leaving it to the probation office to figure it out. Can you give us a quick description of the sentences imposed on each of these? Yes, Your Honor. The defendant black was given a sentence of nine months home confinement and a $300,000 fine. And that would be home confinement in Britain? Yes, that was home confinement in Britain, while defendant Connolly was sentenced to six months home confinement in his home in New Jersey, along with a $100,000 fine. They both had supervised release terms, and I'm sorry, it's two to three years, and I just can't find where in my notes the exact number is. I believe it's in our brief. But your real problem is with the sentence imposed on black with respect to supervised release abroad, right? Yes, Your Honor, because the district court said that this was a serious and not victimless crime, and it believed that foreign home confinement was a substantial punishment. This was before the pandemic, and maybe some of us have different views on how bad that sentence is, but the district court viewed it as substantial. In the current milieu, it is possible that a significant part of defendant black's sentence might not be able to be effectuated. And for that reason, there needs to be a remand. If there isn't a remand, then it could very well be that defendant black's sentence becomes less onerous than defendant Connolly's sentence, even though the district court felt that black deserved a more onerous sentence. She specifically linked the two sentences. She tethered them together. That is why both sentences should be remanded to the district court to just decide, based on a full record, what it believes the appropriate sentence is. Thank you.  Yeah. Which of the three facets of the sentence on black did the government object to in the district court? We did not object after the district court imposed sentence. We did not object to any facet of it, which is why we're here on plain error review for the foreign home confinement aspect of it. We didn't agree with the sentence. We asked for an imprisonment sentence and a larger fine, but we didn't object after it was imposed. What about the use of wealth to fund the home confinement? Didn't the government ask whether the defendant was going to fund that? Yes, Your Honor, we did. You didn't object to the fact that he might be funding it? We did not. So I think that our feeling at that point was if there was going to be a requirement of this 24-hour, seven-day-a-week type monitoring, then certainly the defendant should pay for it. We did not mean to be saying affirmatively that it's necessarily appropriate, given the economic inequities about it. But we didn't make that objection. We agreed that we did not provide the assistance to the district court that we should have, and that's why we're here on plain error review. And what we want, what we're trying to do, is to make sure that the sentence the district court wants to impose is effectuated. Well, it sounds as if it's something that the government considered and simply decided not to object to, rather than something that the government overlooked and just neglected to object to. Your Honor, again, we had every notice and opportunity to object to the foreign home confinement sentence. We agree. After, what happens is that probation did not recommend a foreign home confinement sentence initially. The district court did ask the parties to address any sort of sentence that defendant Black could serve abroad. And the trial team just did not think about foreign home confinement. But defendant Black, in his sentencing submission, did talk about foreign home confinement. But it really just was not in the government's belief on the realm of possibility that that was going to happen. So, I can tell you in good faith that the government just didn't think about it. Right. Well, let me ask you, Ms. Rao, to follow up on Judge Kearse's question. Foreign home confinement. What was the history? What does the record show about the emergence of this idea of foreign home confinement? The first time it was mentioned in the record was with defendant Black's sentencing submission. And he did thoroughly discuss it. The sentencing submissions were filed simultaneously. So, the government didn't have another opportunity in writing at that time to respond. But, again, we agree. We were on notice and had the opportunity to respond. We could have asked to respond in writing or we could have said something at the sentencing hearing. And we didn't. And we didn't.  The probation office. I'm sorry, Your Honor. Go ahead. Probation Officer Kim, who is highly respected by the district court judge, just unfortunately was not at the sentencing hearing. So, defendant Black in the record, at the sentencing record, said something to this effect. We've talked with probation and we believe that they'll be guided by what the district court does. We did not want to put anything in the brief to the court that's not part of the record. I'll just say that we wouldn't be taking this appeal if we didn't have a good faith basis to believe that there's a strong possibility that this sentence cannot be effectuated under current mechanisms. We have no grounds to believe that probation believes that it can be effectuated. And we don't know if neither you nor anyone else on this call has any knowledge of the experience with foreign home confinement and other cases. Well, I can tell you, I looked into it as much as I could, Your Honor. And I checked with other portions of the Justice Department, and we are unaware, I am unaware, of any defendants serving foreign home confinement in a foreign country. It is true that supervised release sometimes is served in a foreign country. And in this case, Judge Rakoff sentenced Kertler and some of the other robbery bank defendants to serve supervised release in a foreign country. But it was not foreign home confinement. And we believe foreign home confinement is qualitatively different because it's restricting someone physically to a certain space. And under the guidelines, it must be enforced through appropriate monitoring, surveillance, whatever that is. And we don't, there's not a record that there is a way to effectuate that. And what about supervised release? Do you think that that can be effectuated? Well, I can say that courts have ordered it, and the government hasn't objected to it. So, yes, we think that we're not taking the position that supervised release, as a general matter, can't be served abroad. But we think that foreign home confinement is a different beast. So foreign home confinement is the only part of the sentence that you're concerned with? Correct. Great. Okay. Thank you very much. Let's be, we have to cut it quickly here. I have a question for this. Oh, yes. Of course. Of course. Counsel, do you accept the argument that the jury just didn't believe witness Perrietti by the acquittal of certain charges? Oh, absolutely not, Your Honor. And why not? Well, it's really the standard of review, Your Honor. That's not what we do. When we look at what the evidence showed, we look at all inferences in favor of the verdict. And it could very well be that the jury was simply being kind at that point. The two counts that they acquitted on three counts, two of them were Perrietti females alone. Not Connelly females. So they might have just felt that Connelly wasn't as responsible for that. The third count that it acquitted on was a continuation of a conversation that they convicted on. So it really could just be a matter of they thought that was enough. They needed to rely on Perrietti's testimony to convict Connelly. They didn't need to rely, but it certainly helped because Perrietti really filled it out. He explained that Connelly is the one who instructed him to make requests for the New York desk to London in general. So we have no reason to think that the jury didn't believe Perrietti's testimony. The district court, no matter what it said at sentencing, in its denial of the motion for acquittal, relied on Perrietti's testimony and credited it as it should, as any court must, because all inferences must be taken in the jury's favor. Thank you, counsel. I have no further questions. Okay. Ms. Levine, if you could just give us the benefit of your rebuttal. So I have a few points, and then I'll hit the sentence. First, the government offered you no answer on falsity. They have not provided you any explanation at all about how you judge falsity under the rule. It is very clear that they have no theory other than you look too intense, and they cannot explain the fact that the rule doesn't say that. There's no rule they've cited. They have no source of interpretation other than the fact that they don't like the conduct. If the rule is not unambiguous, it must fall. Frankly, Your Honor, it is shocking to hear the government continue to rely on Dr. Ewell. Judge McMahon precluded Ewell from testifying about what anybody thought about LIBOR or about the LIBOR rules because he knows nothing about them. He had done some academic research and he can calculate numbers. The judge found that she didn't care what he thought about LIBOR. He has no knowledge of it. In fact, he said he couldn't even find the rules online, so he had to look at them. He didn't know what the concept of reasonable market size was. He provides no support for the government. On the sentencing, Your Honors, first of all, not only did we raise the issue of foreign home confinement in our sentencing submission, the district court repeatedly asks the government to address any possible sentence in the United Kingdom. And the government sent a letter and an email in addition to their sentencing submission where they took the strategic choice to not address foreign home confinement, and they just repeatedly asked for incarceration. It is a pure strategic choice. And as you hold defendants that are represented with very limited means to their waivers, this is a pure waiver case, as the government admitted. Further, Judge McMahon did not express any confusion whatsoever. She was immersed in the record. What she said was, as is true with any supervision in the United States, that the probation department would have to sort out precisely how they do that. Under the rules, home confinement can be supervised in numerous ways. It doesn't only have to be electronic monitoring. But we took it upon ourselves, because we don't think electronic monitoring is even necessary, to provide all of the possibilities of doing that. And Judge McMahon just said, yeah, we'll sort it out if there's an issue. She is supervising Mr. Black. Judge McMahon will make sure that that sentence is supervised. Of course, this court should reverse and vacate the sentence, so we should not even be talking about this. But assuming that that's not the case. Further, pretrial services, excuse me, the probation department, recommended supervised release in the United Kingdom. It is also, Your Honors, really a little much. The cooperators in this case, like Mr. Kertler, is on supervised release in the United Kingdom right now. They regularly sentence people. Mr. Black has been on bail since this case began. He's had no issues. He's lived at home in the United Kingdom. There is no basis in this record whatsoever to have a concern. And after the pandemic that we've all lived through, where we're now arguing cases remotely by phone in this court, something that was unheard of in the past, the notion that a man who is totally compliant and law-abiding and, frankly, is innocent, in my view, could not be supervised, is merely a question that the probation department will sort out, as it does with every single one of its supervisees. And there is nothing in this record, behind idle speculation and the government's sour grapes, to suggest that you should revisit this. They had not one, but multiple opportunities. They chose not to address it. There is no plain error here. I part ways with the district court on the merits here. But on the sentencing, Judge McMahon immersed herself in the rules and gave extremely detailed reasons why she issued the sentence. And the guidelines provide no prohibition against this whatsoever. And, in fact, the only unfairness is the unfairness that if Mr. Black, who is a citizen of the U.K. and should have never been in the United States, cannot get the same kind of sentence he could if he was living in the U.S. And I think it's very important that they have not met any of the standards of plain error. There's no substantial rights. And I think we all take this as a matter of gospel. Mr. Levine, did you say that the U.S. probation office had expressly suggested home confinement in Britain? I said that I believe they expressed that they could supervise release in Britain would be fine. But there was no objection from the probation office. This was in our papers. And, frankly, given the technology, as we pointed out, I don't think this is really even a big deal. And I'm sure that Judge McMahon, if this case is not reversed, who has full supervision over Mr. Black and he is totally compliant, will be able to evaluate if probation has any issues. But what the government doesn't get to do, respectfully, Your Honor, is they didn't just not respond or have a chance. They repeatedly submitted letters asking to impose sentences of incarceration. And they didn't get what they want. And as Judge Pierce pointed out, after the sentence was issued, if they had any concerns when they raised their issue about costs, they could have raised them then. It's a pure waiver. But even on plain error, there's no possibility that they can satisfy that there has been this seriously affected the fairness, integrity, or public perception of the judicial proceeding. Thank you, Mr. Green. Thank you, Your Honor. Quickly, the quote that was cited from the communication with Matt Conley was, again, a conditional request. And there was no evidence that that request led to anything that was outside the range of what was permissible by the BBA. And the simple consideration of that request going to a falsity issue, consideration of a financial position in the Second Circuit does not make a true statement false. USB Skelly cited in our brief. What Skelly says is that in a case involving a broker who didn't disclose financial incentive, the court held otherwise truthful statements about the merits of a particular investment are not transformed into misleading half-truths. Also, El-Tari versus Etsy, which talks about the fact that in opinion statement cases like this, they're only actionable if it's proven that there's both objective falsity and that it was disbelieved by the defendant at the time. Here, there wasn't any, there was a range, so there was not objective falsity. Countrywide home loans, also cited in our brief. There's bad intent, even false intent, fraudulent intent, does not prove a knowing statement. You could go on, Southern District cases, but I won't go on because I know I'm limited in time here. So, Judge Pooler's question about acquitted conduct, you know, the answer we got, I think, tells it all. That the jury was being kind? No, acquitted charges, acquitted conduct can be used, the jury's decision on the merits in a case can be used and considered in appellate review. Its precedent is U.S. v. Fasten, 812, F3, 280, Second Circuit, 2016. There, it was a slightly different situation. It was the defendant's testimony that is ruled not credible, but it was considered in judicial review. The same logic appears here. The government doesn't dispute that authority. Last, dealing with sentencing. I heard that Judge McMahon's district court specifically tethered their sentences. That's completely inconsistent with the record. The judge, district court, made a very specific list of findings about the minimal responsibility of Matt Conley relative to others who've been charged, relative to the cooperators who testified against him, and relative to people within the institution of Deutsche Bank who she commented on were people who likely orchestrated the entire scheme for the benefit of the bank. That was what it was tied to. It wasn't tethered to Gavin Black's sentence, and this procedural error certainly wasn't an error. It should be left the same, and it should not be disturbed. Thank you very much, Mr. Green. Thanks to all three. I have one more question. I have one more question, Judge Cabranes. Sure, go ahead. I think it's to Mr. Levine, but it may be to Mr. Green. Could one of you give me the citation to the record where Judge McMahon said that these defendants were being scapegoated? Is that in the record that we have in front of us? It is in the record, Your Honor. It's at GSA 698 lines 10 through 11. 698? 698 lines 10 through 11. Was that involved in sentencing, or was it just an offhand remark?  What the judge said is that Tommy Black was scapegoated for the sins of the entire industry. All right, thank you very much. She also noted the government cooperated down. Thank you, and thank you, Judge Cabranes. Thank you all. We will reserve the decision, and I'll ask the court to close court. Thank you, Your Honor. Court is adjourned.